UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
F.O. and E.O., individually and on
behalf of Brendan O., a minor,

                Plaintiffs,

       v.                        11 Civ. 6660 (DAB)
                                     OPINION

THE NEW YORK CITY DEPARTMENT OF
EDUCATION,

                Defendant.
--------------------------------------X
DEBORAH A. BATTS, United States District Judge.

    Plaintiffs F.O. and E.O. ("Plaintiffs" or the "Parents"),

individually and on behalf of their minor child Brendan O.

("Brendan"), filed this action against Defendant New York City

Department of Education ("Defendant" or "DOE") on September 23,

2011, pursuant to the Individuals with Disabilities Education

Act ("IDEA"), 20 U.S.C. § 1400, et seq., and Article 89 of the

New York State Education Law, N.Y. Educ. Law § 4401, et seq.

Plaintiffs seek reversal of the June 6, 2011 State Review

Officer Decision ("SRO Decision"), SRO Appeal No. 11-035, which

held that Defendant had offered Brendan a free appropriate

public education and vacated an Impartial Hearing Officer

Decision ("IHO Decision")[1] ordering Defendant to pay and

reimburse Brendan's private school tuition and provide a 1:1

---

[1] The IHO Decision was filed on February 28, 2011 and corrected
on March 25, 2011. All citations to "IHO Decision" refer to the
March 25, 2011 version.

health paraprofessional for the 2010-2011 school year. Both Parties now move for summary judgment. For the reasons stated herein, Plaintiffs' Motion for Summary Judgment is GRANTED in part and DENIED in part and Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part.

## I. BACKGROUND

### A. Legal Framework

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs" and "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A)-(B). States that offer a free appropriate public education ("FAPE") to all children with disabilities are eligible for federal funding under the IDEA. 20 U.S.C. § 1412(a)(1)(A). For a state to receive funding, it must provide each disabled child with an Individualized Educational Program ("IEP"), a "written statement that 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'" D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.,

465 F.3d 503, 507–08 (2d Cir. 2006) (quoting Honig v. Doe, 484 U.S. 305, 311 (1988)). The IEP must offer special education and related services commensurate with each child's need and be "reasonably calculated to enable the child to receive educational benefits." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007) (citation omitted).

New York law charges local Committees on Special Education ("CSEs") with the responsibility of formulating IEPs. N.Y. Educ. Law § 4402(1)(b)(1); R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 175 (2d Cir. 2012). Each CSE is comprised of the child's parent(s) or guardian(s), the child's regular education teacher, the child's special education teacher, and a school psychologist, among other individuals. N.Y. Educ. Law § 4402(1)(b)(1)(a). "In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." Gagliardo, 489 F.3d at 107–08 (citing 8 N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(ww)(3)(i)).

Parents who believe that the state has failed to offer their children a FAPE may file a due process complaint that challenges the adequacy of the IEP. R.E., 694 F.3d at 175. A hearing is then held before an Impartial Hearing Officer ("IHO"). N.Y. Educ. Law § 4404(1). At the IHO hearing, the

school district bears the burden of proving the adequacy of the proposed IEP and the parent seeking tuition reimbursement for an alternative placement bears the burden of proving that the placement is appropriate. N.Y. Educ. Law § 4404(1)(c); accord M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 224-25 (2d Cir. 2012) ("M.H. II"). The IHO's decision may be appealed to a State Review Officer ("SRO"), see 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2), whose decision may be further challenged in state or federal court. 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3)(a).

A parent opposed to his or her child's IEP may also, at his or her own risk, unilaterally place the child in a private school and seek retroactive tuition reimbursement. 20 U.S.C. § 1412(a)(10)(C)(ii); Gagliardo, 489 F.3d at 111. The reimbursement covers "expenses that [the school district] should have paid all along and would have borne in the first instance had it developed a proper IEP." T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009) (citation omitted). The present case comes to the Court following a unilateral placement by Parents and conflicting IHO and SRO decisions concerning Brendan's IEP for the 2010-2011 school year.

B. Factual Background

The following facts are stipulated to by the Parties or are presented in the record of the administrative proceedings.

1. Brendan's Educational and Medical History

Plaintiffs F.O and E.O. are the parents of Brendan O., a child with disabilities born in 2003. (Pls.' 56.1 Stmt. ¶¶ 1, 3.) Brendan is diagnosed with Congenital Myasthenia Gravis Fast Channel Syndrome ("Myasthenia Gravis"), Autistic Spectrum Disorder ("Autism"), and global developmental delays. (Id. ¶¶ 4, 6; IHO Exs.[2] B, at 6; E at 5.) Brendan's Myasthenia Gravis produces muscle weakness and fatigue. (Def.'s 56.1 Stmt. ¶ 7.) He takes medication every two hours to counteract the symptoms, uses a stroller when tired, and generally has limited mobility. (Pls.' 56.1 Stmt. ¶¶ 5, 7; Def.'s 56.1 Stmt. ¶ 7.) Because Brendan has difficulties swallowing food, he requires a nurse to deliver a nutrient-rich fluid directly into his body via a gastronomy tube ("G-tube"). (Pls.' 56.1 Stmt. ¶ 5; Tr.[3] 76:10-23.)

---

[2] "IHO Ex." refers to an exhibit admitted during the due process hearing before the IHO. The Parents' exhibits are lettered A through V, the DOE's exhibits are numbered 1 through 5, and the IHO's exhibits are numbered I and II.

[3] "Tr." refers to the transcript of the IHO hearings, held on five dates between July 20, 2010 and February 1, 2011.

Prior to the 2010-2011 school year, Brendan attended at least three other school programs. At his public preschool program, he was placed in a 10:1:2 classroom, which included ten students, one special education teacher, and two paraprofessionals. (Def.'s 56.1 Stmt. ¶ 10; Tr. 400:6-9.) In early 2009, Brendan attended kindergarten at Mt. Pleasant Blythdale ("Blythedale"), an educational program for New York City children in hospitals. (Pls.' 56.1 Stmt. ¶ 8.) At Blythedale, Brendan was placed in a 12:1:4 classroom that was ultimately set up as a 12:1:2 classroom. (Tr. 399:21-400:6.) The Parents felt that the public preschool and kindergarten placements were "too large[,] . . . too distracting[,] and . . . not something that was appropriate for him." (Tr. 399:14-18.)

On April 29, 2009, a CSE convened to prepare an IEP for Brendan for the 2009-2010 school year. (Pls.' 56.1 Stmt. ¶ 9.) The 2009-2010 IEP classified Brendan as having multiple disabilities and reasoned that Brendan's "developmental and global delays . . . warrant[] a small intensively supervised setting to address [his] genetic medical condition." (IHO Ex. B, at 1, 12.) Because no appropriate public school program was available, the CSE deferred to the district's Central Based Support Team to consider a private school placement. (Pls.' 56.1 Stmt. ¶ 9; Def.'s 56.1 Stmt. ¶ 12.) The Central Based Support Team's search was unsuccessful, and, after a lengthy search for

6

an appropriate school, the Parents unilaterally enrolled Brendan in the Rebecca School, a private school, for the 2009-2010 school year. (Pls.' 56.1 Stmt. ¶¶ 11, 12; IHO Ex. C ¶ 4; Tr. 395:22-396:6) On March 8, 2010, the Parents and the DOE stipulated that the DOE would pay $63,000 for Brendan's attendance at the Rebecca School from November 1, 2009 to June 30, 2010 and would provide a Related Service Authorization[4] for a health paraprofessional for the remainder of the 2009-2010 school year. (Pls.' 56.1 Stmt. ¶ 13; IHO Ex. C ¶¶ 4-5.)

On April 11, 2010, the Parents signed a contract with the Rebecca School to secure placement for Brendan for the following 2010-2011 school year if the DOE did not offer an appropriate program for that school year. (Pls.' 56.1 Stmt. ¶ 14; IHO Ex. K ¶ 4(a).) Pursuant to that contract, the Parents paid a $10,000 deposit, $2,500 of which was non-refundable. (Pls.' 56.1 Stmt. ¶ 15; IHO Ex. K, at 3.)

2. The 2010-2011 IEP

On May 25, 2010, a CSE convened to formulate Brendan's IEP for the 2010-2011 school year. (Pls.' 56.1 Stmt. ¶ 16.) The

---

[4] A Related Service Authorization "allows a family to secure an independent provider paid for by the Department of Education" and "is issued only when a contracted agency cannot provide the service" for the DOE. Office of Related and Contractual Services (ORCS), N.Y.C. Dep't of Educ., http://schools.nyc.gov/Offices/District75/Departments/RelatedServices/ORCS/default (last visited September 18, 2013).

participants in that meeting were the Parents; Feng Ye, the
district representative and a special education teacher; Rose
Fochetta, a school psychologist who conducted a roughly half-
hour observation of Brendan on December 2, 2009; Ruth Acevedo, a
parent member; Amy Racanello, the Parents' advocate from Susan
Luger Associates; Jill Brownley née Lenino, Brendan's special
education teacher from the Rebecca School (via telephone); and
Mayda Kaplan, a social worker from the Rebecca School (via
telephone). (Def.'s 56.1 Stmt. ¶ 15; IHO Exs. F; 4.)

The 2010-2011 IEP classified Brendan as having multiple
disabilities. (Pls.' 56.1 Stmt. ¶ 16.) The IEP included various
annual goals and short-term objectives for Brendan's education,
a number of which were taken directly from the May 2010 Rebecca
School Interdisciplinary Progress Report Update. (Def.'s 56.1
Stmt. ¶¶ 19, 22; Tr. 85:12-22; IHO Exs. E, at 6-14; G, at 7-9.)
The IEP also specified that Brendan would require certain
related services, including a health services paraprofessional,
occupational therapy, physical therapy, speech-language therapy,
nursing services, adaptive physical education, and special
education transportation. (Def.'s 56.1 Stmt. ¶ 24; IHO Ex. E, at
1-2, 5, 17.)

In determining the appropriate classroom, the CSE concluded
that 12:1:1 and 8:1:1 classrooms would be insufficiently
supportive, and rejected placement in a 6:1:1 classroom because

of "Brendan's significant health/physical concerns." (IHO Ex. E, at 16.) The CSE ultimately recommended that the school district place Brendan in a 12:1:4 classroom. (Def.'s 56.1 Stmt. ¶ 28.) At the May 2010 meeting, the Parents objected to the recommendation of a 12:1:4 classroom placement on the basis that prior classrooms of ten or twelve students had been too large or distracting for Brendan, but represented that they remained "interested in" a 6:1:1 classroom. (Def.'s 56.1 Stmt. ¶ 28; IHO Ex. 4, at 1.) The Rebecca School staff opined that neither a 12:1:4 nor a 6:1:1 classroom would be appropriate for Brendan. (IHO Ex. 4, at 1.)

### 3. Unilateral Placement in the Rebecca School

On June 3, 2010, the DOE sent the Parents a final recommendation, based on the 2010-2011 IEP, that offered Brendan placement in a 12:1:4 classroom in P10X @ P300X ("P10X") in the Bronx, New York. (Def.'s 56.1 Stmt. ¶ 32; IHO Ex. 5.) The Parents spent about an hour visiting P10X and speaking with Mark Anderson, the school's unit coordinator. (Pls.' 56.1 Stmt. ¶ 27; Tr. 403:22-25, 406:24-25.) On June 14, 2010, the Parents informed the DOE, via letter, that the placement was inappropriate because of the 12:1:4 class size and P10X's lack of an autism curriculum, lack of equipment to address Brendan's sensory issues, insufficient number of therapists, shared

therapy room, use of tricycle-riding in corridors as part of physical therapy, and middle-school population. (Pls.' 56.1 Stmt ¶ 28; IHO Ex. J, at 3-4.) The Parents wrote that they would send Brendan to the Rebecca School "if the CSE [did] not offer an appropriate program/placement for Brendan by July 1, 2010," and that they would "plan to seek reimbursement for this placement at the public's expense." (IHO Ex. J, at 4.) On August 13, 2010, the Parents again wrote to the DOE that they would be unilaterally enrolling Brendan in the Rebecca School, and that they "plan[ned] to seek reimbursement of tuition for the school at the public's expense." (IHO Ex. J, at 8.)

Brendan did not enroll at P10X and continued in an 8:1:3 classroom at the Rebecca School for the twelve-month 2010-2011 school year, which began on or around July 1, 2010. (Pls.' 56.1 Stmt ¶ 29; Tr. 211:10-11.) Tuition for the school year was $92,100. (Pls.' 56.1 Stmt. ¶ 29.) The Parents' adjusted gross income reported to the Internal Revenue Service in 2009 was $172,507. (Pls.' 56.1 Stmt. ¶ 30.) The DOE provided a 1:1 health services paraprofessional at all relevant times during the school year.[5] (Pls.' 56.1 Stmt. ¶ 31.)

---

[5] On July 28, 2010, the IHO issued an Interim Order on Pendency ordering the DOE to fund a 1:1 health services paraprofessional until the completion of the hearing process. (IHO Interim Order on Pendency, Case No. 127873, July 28, 2010.) On October 27, 2010, the SRO vacated that Order. (SRO Appeal No. 10-083, Oct. 27, 2010.) Following an appeal of that SRO decision in a related

4. The IHO Hearing

On June 28, 2010, the Parents filed a Due Process Complaint with the DOE, requesting a hearing before an IHO. (Pls.' 56.1 Stmt. ¶ 33; IHO Ex. A, at 1.) The Due Process Complaint alleged that the CSE "failed to offer [Brendan] a Free and Appropriate Public Education (FAPE) on both a procedural and substantive basis." (IHO Ex. A, at 5 ¶ 25.) Procedurally, the Due Process Complaint contended that the CSE was not duly constituted, that the Parents were deprived of meaningful participation and were not given a copy of the IEP at the May 2010 meeting, and that the CSE failed to consider non-public school placements. (Id. at 3 ¶¶ 13, 15, 17; id. at 6 ¶ 27.) Substantively, the Parents claimed that the DOE did not offer Brendan a FAPE because the recommendation was contrary to opinions of professionals who had direct knowledge of Brendan's needs, the goals and objectives on the IEP did not reflect all of Brendan's needs, the IEP goals contained no schedules to measure progress, the placement could not address Brendan's dual diagnoses, the placement did not offer an Autism curriculum, and Brendan's occupational therapy mandates may not have been met. (Id. at 3-4 ¶¶ 11, 15, 20-21.)

---

district court action, the DOE voluntarily paid for a paraprofessional during the pendency of the proceedings. See Scheduling Order, F.O. v. N.Y.C. Dep't of Educ., No. 10 Civ. 8510 (DAB) (S.D.N.Y. Jan. 14, 2011), ECF No. 6.

The Parents claimed that they were entitled to, inter alia, payment/reimbursement of the costs of Rebecca School tuition, transportation to the Rebecca School, and the related services laid out in the IEP. (Id. at 4-5 ¶ 25; id at 6 ¶ 35.)

At the IHO Hearing, which took place over five meetings, the DOE called Fochetta and Meghan Crampton, the teacher of the proposed classroom, and the Parents called Brownley; Tina McCourt, a Rebecca School program director; Natalie Kimmelman, a Rebecca School speech therapist; Dr. Jennifer Cross, Brendan's developmental pediatrician; Dr. Maureen Casper, an expert witness; and E.O., Brendan's mother. (Pls.' 56.1 Stmt. ¶¶ 41, 50.)

On February 28, 2011, the IHO held that because the DOE's recommended program at P10X was not "reasonably calculated to provide educational benefit," the DOE had failed to provide Brendan with a FAPE. (IHO Decision 11-12.) Accordingly, the IHO ordered the DOE to reimburse the Parents' $10,000 deposit, pay the remaining $82,100 in tuition to the Rebecca School, and provide a 1:1 health services paraprofessional and busing for the 2010-2011 school year. (Id. at 13-14.)

The IHO relied on Fochetta and Dr. Cross's testimony that due to his Myasthenia Gravis and Autism, Brendan required "a small supportive classroom" and that Autism was his "most significant disability" in an educational setting. (Id. at 10.)

12

She found that in recommending a 12:1:4 classroom, the CSE focused too much on Brendan's physical and medical needs and did not give appropriate attention to Brendan's Autism. (Id. at 10-11.) The IHO reasoned that Brendan needed a "highly structured, intensive approach that is specifically tailored to address all his pervasive deficits within the context of his autism," and the program recommended by the IEP would not provide such an approach. (Id. at 11.) The IHO further opined that the CSE's assumptions or hopes that any licensed special education teacher would be qualified to work with an autistic student were insufficient to ensure that Brendan received a FAPE. (Id.) Although Crampton did have such experience, the IEP did not guarantee that she would be Brendan's teacher, and the CSE had no input into Brendan's specific class placement. (Id.) Furthermore, Crampton's 12:1:4 classroom was mostly comprised of non-verbal students with disabilities dissimilar to Autism, who would not be appropriate peers for Brendan. (Id.)

The IHO next found that the Rebecca School was an appropriate unilateral placement, citing Brendan's numerous improvements under the school's instruction. (Id. at 12.) The IHO rejected the DOE's arguments that, because the Rebecca School did not provide mainstreaming and relied on third-party providers for certain mandated services, it was not an appropriate placement; mainstreaming, the IHO stated, would be

of "limited benefit" to Brendan because his significant disabilities impaired his ability to interact with non-disabled students, and the DOE itself often supplemented its own placements with RSAs. (Id. at 12-13.) Finally, the IHO determined that the Parents had cooperated with the DOE and thus equitable considerations did not bar relief. (Id. at 13.)

### 5. The SRO Appeal

The DOE appealed the IHO's decision on April 1, 2011. (Pls.' 56.1 Stmt. ¶ 63.) The Parents cross-appealed "any adverse rulings made by the impartial hearing officer and/or any issues that were not addressed by the impartial hearing officer in her decision." (Pls.' SRO Answer 13.) On June 6, 2011, the SRO reversed the IHO Decision and found that the DOE offered Brendan a FAPE for the 2010-2011 school year. (Def.'s 56.1 Stmt. ¶ 66.)

Contrary to the IHO, the SRO held that Brendan's IEP "accurately reflected [his] multiple needs, included appropriate annual goals and short-term objectives to address [those needs], and provided the student with an appropriate program." (SRO Decision 14.) In finding that the IEP appropriately addressed Brendan's Autism, the SRO relied primarily on Fochetta's testimony that the IEP was sufficient and Crampton's testimony regarding the strategies she uses in her particular classroom. (Id. at 17.) Furthermore, the SRO elaborated that "the IDEA

14

ensures an 'appropriate' education, but school districts are not required to 'maximize' the potential of students with disabilities." (Id. (citing Bd. of Educ. v. Rowley, 458 U.S. 176, 189, 199 (1982); Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 379 (2d Cir. 2003); Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 132 (2d Cir. 1998)).) The SRO found that in light of its determination that the DOE had offered Brendan a FAPE, it was "not necessary to reach the issue of whether the Rebecca School was appropriate for the student," the issue of "whether equitable considerations support the parents' claim," or "the parties' remaining contentions." (Id. at 19.)

The SRO dismissed the Parents' cross-appeal as so unduly vague and ambiguous as to preclude meaningful review. (Id. at 18.) He held in the alternative that, to the extent that the Parents argue that the IHO erred in failing to issue a subpoena or rejecting the Parents' procedural objections to the IEP, the Parents' cross-appeal was meritless. (Id. at 18-19.)

On September 23, 2011, the Parents brought the instant action to appeal the April 1, 2011 SRO Decision.

15

## II. DISCUSSION

### A. Legal Standard

#### 1. Summary Judgment Standard

IDEA actions are generally resolved by district courts at the summary judgment stage. K.S. v. N.Y.C. Dept. of Educ., No. 11 Civ. 7443, 2012 WL 4017795, at *6 (S.D.N.Y. Aug. 8, 2012). District courts base their decisions on the preponderance of the evidence, taking into consideration both the record of the administrative proceedings and any additional evidence provided by the parties. Grim, 346 F.3d at 380. However, "[s]ummary judgment in this context involves more than looking into disputed issues of fact; rather, it is a pragmatic procedural mechanism for reviewing administrative decisions." R.E., 694 F.3d at 184 (quoting A.C. ex rel. M.C. v. Bd. of Educ., 553 F.3d 165, 171 (2d Cir. 2009)).

In reviewing a dispute over an IEP, the district court occupies "the paradoxical position of [being] both an independent fact finder and a judicial body bound to review and give deference to the findings of an administrative agency." Wall v. Mattituck-Cutchogue Sch. Dist., 945 F. Supp. 501, 507 (E.D.N.Y. 1996)); see M.H. II, 685 F.3d at 244 ("[T]he standard for reviewing administrative determinations requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete de novo

16

review." (citation and alterations omitted)). Although a district court must perform an "independent judicial review" of the administrative decisions and may not merely "rubber stamp" them, its role is also "circumscribed." M.H. II, 685 F.3d at 240 (citations omitted). A court must give "'due weight' to [administrative] proceedings, mindful that the judiciary generally 'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" Walczak, 142 F.3d at 129 (alterations omitted) (quoting Rowley, 458 U.S. at 206, 208). For instance, class size and instructional programming are matters of educational policy concerning which courts defer to a state administrative officer. N.Y.C. Dep't of Educ. v. V.S., No. 10 Civ. 5120, 2011 WL 3273922, at *13 (E.D.N.Y. July 29, 2011) ("[Q]uestions of class size, teaching methodologies and educational environments involve exactly the types of educational policy issues that require district court deference to state administrative agencies."). In short, an independent review is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206; see Grim, 346 F.3d at 383 (holding that the court may not "cho[ose] between the views of conflicting experts on a controversial issue of educational policy . . . in direct

contradiction of the opinions of state administrative officers who had heard the same evidence.").

Nonetheless, "the deference owed to an [administrative] decision depends on the quality of that opinion." R.E., 694 F.3d at 189. In particular, courts should afford more weight to administrative decisions that are "well-reasoned." Id. (citation omitted); see M.H. II, 685 F.3d at 244 ("Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not."); Walczak, 142 F.3d at 129 ("Deference is particularly appropriate when . . . the state hearing officers' review has been thorough and careful."). When the two administrative decisions, those of the SRO and the IHO, disagree, the court "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." R.E., 694 F.3d at 189; see M.H. II, 685 F.3d at 246 ("[W]hen . . . the district court appropriately concludes that the SRO's determinations are insufficiently reasoned to merit . . . deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis . . . ."). "Accordingly, [a party]

seeking to have a reviewing court credit an IHO's determination over an SRO's determination would benefit from calling [the court's] attention to an SRO's specific errors in law, fact, or reasoning." M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ., 725 F.3d 131, 2013 WL 3868594, at *4 (2d Cir. 2013).

The Second Circuit has broadly agreed on several other factors that affect the deference owed to a state administrative officer. "[D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures." R.E., 694 F.3d at 189 (citation omitted). "Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress." Id. Finally, "the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency." Id.

### 2. Burlington/Carter Test

Determining whether parents are entitled to tuition reimbursement requires district courts to engage in a three-pronged test, often referred to as the Burlington/Carter test. A

court must first consider whether "the IEP proposed by the school district [was] inappropriate." Gagliardo, 489 F.3d at 111 (citing Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 370 (1985)). Second, the court must ask whether "the private placement [was] appropriate to the child's needs." Id. at 111-12 (citing Burlington, 471 U.S. at 370). Third, if both prongs are satisfied, "the district court enjoys broad discretion in considering equitable factors relevant to fashioning relief." Gagliardo, 489 F.3d at 112 (citing Florence Cnty. Sch. Dist. Four v. Carter, 510 U.S. 7, 16 (1993)); see 20 U.S.C. § 1412(a)(10)(C)(ii) ("[A] court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment.") (emphasis added). "Because the State Review Officer[] in [this case] concluded that the IEP[] w[as] proper, and the courts are bound to exhibit deference to that decision, the burden of demonstrating that the respective Review Officer[] erred is properly understood to fall on the plaintiffs." M.H. II, 685 F.3d at 225 n.3.


## B. Additional Evidence

Before the Court reaches the issue of whether the Parents satisfy the Burlington/Carter test, the Court addresses the Parents' request to consider the 2011-2012 IEP as additional evidence that the challenged 2010-2011 IEP was not appropriate.

(Pls.' Mem. Law Supp. Cross-Mot. Summ. J. ("Pls.' Mem.") 6, 18;
Pls.' Mem. Law Reply Def's Opp'n & Further Supp. Pls.' Mot.
Summ. J. ("Pls.' Reply") 2-3.) The 2011-2012 IEP states that,
for the 2011-2012 school year, "[a] special class in a
specialized school with a student to teacher ratio of 12:1:4 was
considered and rejected as unable to meet [Brendan's]
social/emotional needs." (Weinberg Decl. Ex. A, at 15.)

    The IDEA provides that "the court . . . shall hear
additional evidence at the request of a party." 20 U.S.C. §
1415(i)(2)(C)(ii). However, the Second Circuit has held that "an
IEP must be evaluated prospectively as of the time it was
created." R.E., 694 F.3d at 188; see D.F. ex rel. N.F. v. Ramapo
Cent. Sch. Dist., 430 F.3d 595, 599 (2d Cir. 2005) ("An IEP is a
snapshot, not a retrospective," that "must take into account
what was, and was not, objectively reasonable when the snapshot
was taken, that is, at the time the IEP was promulgated."
(citation omitted)). At the time that the 2010-2011 IEP was
created, the 2011-2012 IEP did not exist. Accordingly, the Court
will not consider the 2011-2012 IEP in determining whether the
2010-2011 IEP was appropriate. See M.H. ex rel. H.H. v. N.Y.C.
Dep't of Educ., No. 10 Civ. 1042, 2011 WL 609880, at *11 n.6
(S.D.N.Y. Feb. 16, 2011) ("[A]n IEP postdating the one at issue
in this case is of little probative value for evaluating
'appropriateness' in this case."), aff'd, 685 F.3d 217.

C. Tuition Reimbursement

1. Appropriateness of 2010-2011 IEP

In considering whether the proposed IEP provided the student with a FAPE, courts assess whether the IEP was "reasonably calculated to enable the child to receive educational benefits."[6] <u>Cerra v. Pawling Cent. Sch. Dist.</u>, 427 F.3d 186, 192 (2d Cir. 2005) (citation and alteration omitted). A school district fulfills this requirement if it provides an IEP that is "likely to produce progress, not regression," and "affords the student with an opportunity greater than mere 'trivial advancement.'" <u>Id.</u> at 195 (citation omitted). "In order to avoid 'impermissibly meddling in state educational methodology,' a district court 'must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan.'" <u>Id.</u> (citation omitted).

---

[6] Generally, courts first consider "whether the state has complied with the procedures set forth in the IDEA." <u>Cerra v. Pawling Cent. Sch. Dist.</u>, 427 F.3d 186, 192 (2d Cir. 2005). Because the Court finds the IEP substantively inadequate, it does not reach the issue of procedural adequacy, on which grounds the Parents do not move for summary judgment. <u>See</u> <u>M.H. II</u>, 685 F.3d at 245 ("If an IEP is deficient—<u>either</u> procedurally <u>or</u> substantively—the court then asks 'whether the private schooling obtained by the parents for the child is appropriate to the child's needs.'") (citation and alteration omitted) (emphasis added).

For the reasons discussed below, the Court finds that the SRO's decision as to whether the IEP provided Brendan with a FAPE was inadequately reasoned. Accordingly, the Court does not defer to the SRO's determination that the IEP was substantively adequate. Instead, the Court defers to the IHO's well-reasoned and well-supported findings and conclusions. See R.E., 694 F.3d at 189 ("[A] court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead.")

The SRO's opinion failed to consider thoroughly or carefully contrary testimony from witnesses present at the IHO hearing, even when that testimony was relied upon by the IHO. Most significantly, the SRO did not address, in any substantive way, the testimony of Brendan's treating physician, Dr. Cross. Dr. Cross testified that Autism was Brendan's most pressing educational need and that children with Autism benefit most from programs specifically targeted to address autistic features. (Tr. 376:7-20, 388:8-20.) The SRO quoted this testimony, but addressed it only by writing, without citation to any evidence, that "the hearing record demonstrates that the May 2010 IEP and the district's recommended 12:1+4 special class would have appropriately addressed the student's needs related to his autism . . . that must be managed within the educational

setting."[7] (SRO Decision 18.) This "conclusory assertion[]
utterly fail[s] to meet the [Second Circuit's] standard," and
does not require deference. B.R. ex rel. K.O. v. N.Y.C. Dep't of
Educ., 910 F. Supp. 2d 670, 678 (S.D.N.Y. 2012); see also M.H.
II, 685 F.3d at 249 ("The SRO . . . did no more than state
summarily that the goals 'comprehensively addressed the
student's needs in the areas.' . . . [T]he SRO's conclusory
statement does not evince thorough and well-reasoned analysis
that would require deference.") (alterations omitted). In
contrast to the SRO's cursory treatment of Dr. Cross's
testimony, the IHO thoroughly examined the merits of Dr. Cross's
testimony and explained why she found it persuasive. (See IHO
Decision 10.) Furthermore, the IHO addressed why Dr. Cross's
testimony was persuasive, reasoning that Dr. Cross was "a
pediatrician who not only has extensive professional experience
with autism but who has been [Brendan]'s treating physician for
four years." (Id.)

    The SRO not only failed to consider thoroughly Dr. Cross's
testimony, but also failed to analyze conflicting testimony from
any of the Parents' witnesses. Though the SRO Decision mentioned
certain testimony from these witnesses, it did not analyze or

---

[7] The SRO's conclusion gains no traction even if the Court
assumes that the SRO was referring to the preceding paragraph.
(SRO Decision 17.) That paragraph consists primarily of
retrospective testimony, reliance on which is prohibited. R.E.,
694 F.3d at 186; see infra.

explain their testimony or discuss why it was less persuasive than that of the DOE's witnesses.[8] (See SRO Decision 16-18.) Instead, the SRO considered only the testimony of two DOE witnesses, Ms. Fochetta and Ms. Crampton. (Id. at 17.)

The SRO's legal rationale for his failure to consider contrary testimony is unconvincing. The SRO explained his decision not to examine testimony by paraphrasing M.H. ex rel. H.H., 2011 WL 609880, at *12, writing, "Although the CSE is required to consider the opinions of private experts that are offered by the parents, it is not required to adopt their recommendations for different programming." (SRO Decision 18 (citing cases).) However, the court in M.H. ex rel. H.H. could not have intended to insulate the SRO from analyzing contrary testimony or evidence. See M.H. ex rel. H.H., 2011 WL 609880, at

---

[8] Those few instances of citation to the Parents' witnesses contain no analysis of the witnesses' conflicting testimony. See M.H. v. N.Y.C. Dep't of Educ., 712 F. Supp. 2d 125, 166 n.18 (S.D.N.Y. 2010) ("[T]he SRO failed to distinguish, explain, or otherwise analyze certain conflicting evidence in his analysis."), aff'd, 685 F.3d 217. For example, the SRO mentioned E.O.'s claim, based on Brendan's prior participation in a 12:1:4 program, that a 12:1:4 class would be too large, too distracting, and inappropriate for Brendan. (SRO Decision 16.) However, rather than explaining why this description of Brendan's past experiences was unpersuasive, the SRO stated, "Ultimately, the CSE determined . . . that a 12:1+4 special class could better address the student's multiple needs." (Id.) The SRO did not explain why the 12:1:4 class was better or why the CSE's then-overturned view was persuasive. (Id.) Testimony from the Parents' witnesses was otherwise used only to provide factual background (see id. at 2, 4) or to describe the Rebecca School (see id. at 1).

*12 (noting that the SRO performed a "careful analysis of the record"). Indeed, it is difficult to imagine how failing to address conflicting evidence could produce a "well-reasoned" decision.[9] R.E., 694 F.3d at 189; see C.L. v. N.Y.C. Dep't of Educ., No. 12 Civ. 1676, 2013 WL 93361, at *7 (S.D.N.Y. Jan. 3, 2013) ("[T]he critical fact remains that the SRO did not grapple with contrary evidence and gave no explanation for why it credited the unfounded assertions of a school psychologist who had observed [the student] for only an hour and a quarter over the cogent testimony of multiple highly credentialed teachers who had worked closely with [the student] for a full school year."); M.H. v. N.Y.C. Dep't of Educ. (M.H. I), 712 F. Supp. 2d 125, 161 (S.D.N.Y. 2010) ("The SRO's decision on this point does not warrant deference because the SRO improperly excluded Plaintiffs' substantial methodology evidence, [but] [n]otably,

---

[9] The Court finds unpersuasive the DOE's counterargument here that the SRO was justified in disproportionately relying upon the DOE's witnesses, especially Fochetta. (Def.'s Mem. 13-14.) The DOE contends that "this sort of weighing of conflicting evidence is exactly the sort of area in which [judges are] required to defer to the SRO." (Id. at 13 (quoting W.S. v. Rye City Sch. Dist., 454 F. Supp. 2d 134, 145 (S.D.N.Y. 2006).) However, the SRO must actually weigh conflicting evidence before the Court defers to the SRO for weighing conflicting evidence; it is difficult to characterize the SRO's stubborn reliance on the DOE's witnesses, and failure to account for other witnesses' conflicting testimony, as "weighing" anything. See M.H. I, 712 F. Supp. 2d at 166 n.18 ("By contrast, the SRO's decision reveals that, far from merely weighing evidence differently, the SRO failed to distinguish, explain, or otherwise analyze certain conflicting evidence in his analysis.").

the SRO <u>did not</u> exclude the DOE's methodology evidence . . .
."), <u>aff'd</u>, <u>M.H. II</u>, 685 F.3d 217; <u>G.B. ex rel. N.B. v. Tuxedo
Union Free Sch. Dist.</u>, 751 F. Supp. 2d 552, 581-82 (S.D.N.Y.
2010) (reversing SRO decision that failed to "properly consider
expert testimony"), <u>aff'd</u>, 486 F. App'x 954 (2d Cir. 2012).

The very cases that the SRO cited support the Court's
conclusion. In two of the cited cases, the SRO or the court
considered contrary testimony and, before discounting that
testimony, gave specific reasons as to why it was not
persuasive. <u>See</u> <u>M.H. ex rel. H.H.</u>, 2011 WL 609880, at *6 (noting
that an SRO decision had discounted a psychiatrist's testimony
because the psychiatrist was "not familiar with the recommended
school" and her evaluation reports omitted class size
recommendations); <u>Marshall Joint Sch. Dist. No. 2 v. C.D. ex
rel. Brian D.</u>, 616 F.3d 632, 641 (7th Cir. 2010) (reversing an
administrative decision because it relied too heavily on the
testimony of a doctor who was "not a trained educational
professional and had no knowledge of the subtle distinctions
that affect classifications under the [IDEA] and warrant the
designation of a child with a disability and special
education"). In the third case, a court in the Northern District
of New York did not explain why it was discounting testimony,
but stated that the discounted witness was a "separately hired

expert." <u>Watson v. Kingston City Sch. Dist.</u>, 325 F. Supp. 2d 141, 145 (N.D.N.Y. 2004).

Here, one of the Parents' six witnesses, Dr. Casper, was a separately hired expert, but the other five witnesses had significant educational or medical relationships with Brendan, and their testimony called into question the appropriateness of the IEP. The Parents' witnesses testified, among other things, that Brendan required a small class, a class of twelve students would be too large, Autism affected Brendan's education more than Myasthenia Gravis, the 12:1:4 program would not be appropriate, and Brendan's educational advancement required verbal peers in a classroom setting. (<u>See</u> IHO Decision 6-9.) The Court cannot deem the SRO Decision to be "thorough and careful," or adequately reasoned, without it having at the very least considered the testimony of conflicting non-hired experts, and provided some legitimate reasons for discounting that testimony. See <u>E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.</u>, 742 F. Supp. 2d 417, 435 (S.D.N.Y. 2010) ("[T]he SRO decision . . . was a fair and objective review of the evidence" when "[t]he SRO paid careful attention to the student's evaluations, the parents' comments, the recommendations of the parents' experts, and how the IEPs were developed."). In contrast, the IHO Decision was far more thorough and careful. The Decision gave a careful description of the testimony of all eight witnesses,

synthesized relevant conclusions from each witness's testimony, and explained that Dr. Cross's testimony was particularly persuasive because of her "extensive professional experience with autism" and her four-year treating relationship with Brendan. (IHO Decision 3-10.) Moreover, the IHO analyzed Fochetta's testimony about Brendan's disabilities, his need for a small class size, her expectations regarding the implementation of the IEP, and the CSE's inability to pick a particular school, class, or teacher for Brendan, and concluded that this testimony supported placing Brendan in a 6:1:1 classroom. (Id. 10-11.) The IHO also parsed Crampton's testimony and explained why her classroom was not appropriate for Brendan. (Id. 11.)

Even the SRO's treatment of the DOE witnesses is problematic, and evinces neither careful analysis nor adequate reasoning. The SRO omitted damaging statements in Fochetta's testimony, statements that the IHO explicitly addressed. See M.H. I, 712 F. Supp. 2d at 166 n.18. First, the SRO ignored Fochetta's testimony that a 12:1:4 classroom was designed for students whose primary educational difficulty is their physical disability:

> HEARING OFFICER LUSHING: Right, but the predominant or -- or the -- the [disability] that is being focused on would be the physical?
>
> MS. FOCHETTA: That's fair to say, yes.

(Tr. 113:13-16.) This revelation was especially troubling in light of Dr. Cross's testimony that Autism was "dramatically more impairing to him in the classroom than the myasthenia gravis is," testimony which the SRO improperly disregarded. (Tr. 388:8-10.) Second, absent from the SRO's analysis was the fact that Fochetta, despite being one of the people who formulated the IEP, relied on assumptions about the placement that may never have materialized. While Fochetta believed that Brendan could be adequately served because she "anticipate[d] [that the] IEP would be followed," (Tr. 114:6-8), the Parents correctly point out that Fochetta's particular "recommendation for a 12:1:4 multiple handicapped classroom was based, in part, on the assumption that the proposed school would also have 6:1:1 autism classrooms." (Pls.' Mem. 17 (citing Tr. 114).) When the IHO asked Fochetta, "was there any concern that -- that the teacher or the other support staff would have minimal or no experience with autism?", Fochetta responded:

> MS. FOCHETTA: Well, in -- oftentimes -- I think that wasn't a main concern, because many of the programs, the specialized schools, have more than one classroom ratio. For instance, they may have, in the same school, a 6:1:1, a 12:1:4, a 12:1:1, an 8:1:1, and they are often intermingled so that there is that support -- oftentimes. And again, I don't know about this particular school, the site that was offered to him, but that does exist.

(Tr. 114:14-115:2.)[10] P10X, however, did not have any of these
other classrooms, and no school with these features was ever
guaranteed. (Tr. 404:3-5; see generally IHO Ex. E.) The IHO
Decision addressed Fochetta's testimony and considered how to
credit her statements in light of the fact that she only
"assumed," "hoped," and "anticipated" that Brendan's educational
needs would be served.[11] (IHO Decision 11.)

    The Court finds that the SRO's failure to consider
Fochetta's inconvenient testimony was improper, and that the IHO
Decision was better reasoned with regard to Fochetta's
testimony. See M.H. II, 685 F.3d at 252 ("[T]he SRO's failure to
consider . . . evidence . . . is more than an error in the
analysis of proper educational methodology. It is a failure to
consider highly significant evidence in the record. This is
precisely the type of determination to which courts need not

_____

[10] Fochetta's later testified:

> I don't know which school was recommended or the
> specifics of that sites. But let's assume a program
> had all of the -- all of the available ratios. You
> would have staff there then who I would hope would be
> experts in autism, and those that would be -- and
> experts in managing health and physical concerns, and
> my belief is that they can, and should, communicate to
> help meet the needs of an individual.

(Tr. 116:15-23.)
[11] Strikingly, the SRO cited to other testimony from the same
group of pages that the IHO discussed, and that the Court now
discusses. (See SRO Decision 17 (citing Tr. 110-11, 113-15,
117).)

defer, particularly when the evidence has been carefully considered and found persuasive by an IHO."); see also B.R., 910 F. Supp. 2d at 678 (deferring to the IHO when "the SRO . . . utterly fail[ed] to address the specific evidence actually presented to the IHO on [an] issue.").

Finally, the SRO's findings as to the adequacy of the IEP rest primarily on Crampton's inadmissible retrospective testimony. An SRO "may rely on testimony that describes both an IEP's recommended method and 'why it was appropriate,' or testimony explaining how an IEP recommended service 'operates.'" T.B. v. Haverstraw-Stony Point Cent. Sch. Dist., No. 11 Civ. 5421, 2013 WL 1187479, at *18 n.12 (S.D.N.Y. Mar. 21, 2013) (quoting R.E., 694 F.3d at 186-87); see R.E., 694 F.3d at 185 ("[T]estimony regarding state-offered services may only explain or justify what is listed in the written IEP."). However, the SRO may not rely on "retrospective testimony that the school district would have provided additional services beyond those listed in the IEP." R.E., 694 F.3d at 186. For instance, "testimony that a different teaching method, not mentioned in the IEP, would have been used" may not be considered by the SRO. Id. at 186-87; see also P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ., Nos. 11-3525, 11-3633, 2013 WL 2158587, at *3 (2d Cir. May 21, 2013) ("Retrospective testimony is 'testimony that certain services not listed in the IEP would actually have been

provided to the child if he or she had attended the school district's proposed placement.'") (quoting R.E., 694 F.3d at 185).

Here, the SRO impermissibly employed Crampton's testimony to demonstrate the services that Brendan would have been provided in her particular classroom rather than to explain or justify the IEP's services. See P.K., 2013 WL 2158587, at *4 ("[N]either the state review officers nor our Court may justify the CSE's IEP based on evidence about the . . . services [the student] would actually receive in her public school placement."). However, the IEP gave the Parents "no guarantee of any particular teacher. Indeed, even the [DOE] cannot guarantee that a particular teacher or aide will not quit or become otherwise unavailable for the upcoming school year." R.E., 694 F.3d at 187. "Thus, it is error to find that a FAPE was provided because a specific teacher would have been assigned or because of actions that specific teacher would have taken beyond what was listed in the IEP." Id. The SRO relied on Crampton's testimony of classroom teaching methods and strategies absent from the IEP, including the TEACCH methodology, to reinforce the appropriateness of the 12:1:4 placement. (SRO Decision 17.) In particular, the SRO credited Crampton's testimony that she would have used a "picture exchange communication system (PECS), . . . sign-language, . . . augmented communication devices, . . .

33

individualized activities designed by the occupational therapist, auditory and tactile stimulation, . . . a water table, . . . a classroom schedule and individual schedules for each student," and "individualized instruction through the use of trial and data collection." (Id.) The IEP mentioned none of these instructional techniques. (IHO Ex. E); see R.E., 694 F.3d at 192 (holding that a classroom teacher's testimony about "specific classroom techniques" was "inappropriate"). In contrast, though the IHO engaged in a thorough analysis of the substance of Crampton's testimony, the IHO also cautioned that because "the CSE team had no input into the specific site and class selected for placement," Crampton's testimony of her particular methods was merely "[c]oincidental[]." (IHO Decision 11.) The IHO accordingly afforded Crampton's testimony less weight and did not use it to mend deficiencies in the IEP. (See id.)

The SRO's treatment of various witnesses convinces the Court that the SRO erred at every juncture available and failed to support his findings with a thorough and careful evaluation of the evidence. Hence, finding the SRO Decision inadequately reasoned, the Court next considers the better-reasoned IHO Decision. See R.E., 694 F.3d at 189.

Once retrospective testimony is removed from the balance, and the record as a whole is considered, the preponderance of

the evidence supports the IHO's conclusion that Brendan's IEP was inappropriate. See P.K., 2013 WL 2158587, at *4; R.E., 694 F.3d at 194 ("[H]aving reviewed the record, we conclude that the IHO's decision was sufficiently supported, and we therefore defer to the IHO's conclusion that the IEP was not reasonably calculated to create educational benefit . . . ."); see also 20 U.S.C. § 1415(i)(2)(C). Because the Parties' dispute is about the recommended class size and instructional program offered, the Court gives due weight to the IHO's judgment, which is "informed by greater educational expertise than that of judges." M.H. II, 685 F.3d at 246.

The IHO's finding that Autism is Brendan's most significant disability in an educational setting is well-supported. (IHO Decision 10.) Neither Party challenges this, nor could they. The testimonies of multiple witnesses, including Brownley, Dr. Casper, and Dr. Cross, overwhelmingly support the IHO's finding that Autism affects Brendan academically much more than Myasthenia Gravis. (Tr. 256:23-258:7, 327:9-23, 360:8-363:14, 374:1-375:25, 378:1-382:21, 388:3-20; see also Tr. 76:7-78:16.) Although Dr. Casper and Dr. Cross testified that Myasthenia Gravis can physically impact speech and writing, both doctors also stressed that, in comparison, addressing Autism was Brendan's primary educational need. (Tr. 327:9-23, 360:8-363:14, 380:13-382:21, 388:3-20.) This conclusion is corroborated by two

letters from physicians which detailed the social and academic effects of Autism on Brendan and represented the effect of Myasthenia Gravis on Brendan as primarily physical. (IHO Exs. H; I, at 1.)

Likewise, the IHO's finding that Brendan needed "a quiet and supportive environment as measured by the ratio of students to adults" is supported by a preponderance of evidence. (IHO Decision 10-11.) Testimonies of Fochetta, McCourt, and Dr. Casper support the IHO's finding that Brendan required a small class size. (Tr. 108:7-16, 213:6-18, 334:12-24.) McCourt, in particular, testified that "fast moving-paced children, things that are happening quickly around him, [Brendan] gets lost in that. . . . He isn't always able to ambulate successfully independently, and if there are too many children in the class, he could get lost in that shuffle." (Tr. 213:12-18.) Similarly, Brendan's medical reports and IEP predating the formulation of the 2010-2011 IEP recommended a small class size. (IHO Exs. B, at 12; O; S, at 5; 1, at 7.) Mindful that class size is a matter of educational policy, the Court defers to the IHO's determination that a 12:1:4 class size was not small enough to produce non-trivial progress. See V.S., 2011 WL 3273922, at *13.

The IHO's conclusion that Brendan required "a highly structured, intensive approach that is specifically tailored to address all his pervasive deficits within the context of his

autism" is also well-supported. (IHO Decision 11.) Dr. Casper
and Dr. Cross substantively corroborated this precise finding.
(Tr. 330:6-332:9, 334:25-336:3, 349:4-15, 376:7-377:12.)
Fochetta conceded that such a program would be, at the very
least, helpful for Brendan. (Tr. 108:7-22.) Various medical
letters and reports made the same recommendation that Brendan be
placed in a program that specifically targeted Autism. (IHO Exs.
H; O; S, at 5; 1, at 7.) For example, Dr. Cross's February 4,
2010 Developmental Pediatric Report concluded that "Brendan is
now in a program that serves Autistic Children" and that "th[is]
factor[] [is a] necessary requirement[] for Brendan's program."
(IHO Ex. O, at 2.)

     The IHO's subsequent finding that the IEP did not provide a
program targeted towards Autism is also sufficiently supported
by the record. (IHO Decision 11.) Dr. Casper directly opined
that the instructional techniques used in Brendan's IEP would
not provide adequate support. (Tr. 329:3-25, 342:7-17.) A
medical letter further stated that "[a]ny deviation" from
Brendan's Rebecca School program, which used different
instructional techniques than were recommended in the IEP,
"would result in a devastating regression for this child." (IHO
Ex. H.) Dr. Cross's Developmental Pediatric Report strongly
recommended that Brendan remain in the Rebecca School's program,
because "this seems to be the only program that can really

provide all the services he needs." (IHO Ex. O, at 3.) Fochetta,
the DOE's own witness, also testified that a 12:1:4 program
primarily focused on students' physical disabilities, while a
6:1:1 program was comprised mostly of students diagnosed with
Autism. (Tr. 113:4-16.)[12]

In general, the Parties' dispute concerns the
appropriateness of particular instructional programming and
class size in addressing Brendan's conditions, questions best
left to the SRO or, if the SRO decision is inadequately
reasoned, to the IHO. See R.E., 694 F.3d at 189; V.S., 2011 WL
3273922, at *13. Deferring to the well-reasoned and well-
supported IHO Decision on these matters of educational policy,
the Court finds no basis on which to disturb the IHO's findings.

---

[12] Fochetta's testimony that teachers in a 12:1:4 classroom could
adequately focus on Autism because they "are licensed special
education teachers, [who] should certainly have knowledge of the
disorder and experience with it," is far from dispositive of the
IEP's appropriateness. (Tr. 117:8-10.) Fochetta's testimony here
is inconsistent with her earlier testimony that, because
teaching students with Autism requires "special expertise,"
Brendan's teacher in a 12:1:4 program might require additional
support from other teachers more knowledgeable about Autism.
(Tr. 114:9-116:23.) Fochetta's earlier testimony introduces
significant doubt as to whether the 12:1:4 placement was capable
of fulfilling her own expectations. Moreover, the level of
expertise that staff require to instruct a particular student is
a matter of educational policy, and the Court accordingly defers
to the IHO's judgment. See R.E., 694 F.3d at 192 (determining
that a recommendation of paraprofessional support, and not
teacher support, is an educational policy judgment as to which
deference is warranted).

The DOE's arguments against this finding are unpersuasive. First, the DOE argues that the IEP catalogued Brendan's needs well and included appropriate objectives. (Def.'s Mem. Law Supp. Cross-Mot. Summ. J. ("Def.'s Mem.") 9-11; Def.'s Mem. Law Opp'n Pls.' Cross-Mot. Summ. J. ("Def.'s Opp'n") 6-7; Def.'s Reply Mem. Law Further Supp. Its Cross-Mot. Summ. J. ("Def.'s Reply") 2-3.) Even assuming this to be true, the DOE's argument misses the mark. The question is not whether the CSE understood Brendan's needs; it is whether the IEP recommended a program appropriate to meet those needs.

Second, the DOE briefly contends that the Parents' arguments against the appropriateness of the placement were "speculative" because "[Brendan] never actually attended P010X." (Def.'s Opp'n 9; Def.'s Reply 4.) The DOE's argument might have had merit were the Parents speculating that an appropriate IEP would not have been implemented appropriately. See R.E., 694 F.3d at 195 ("Speculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement."). However, the Parents are arguing that the IEP and its recommended program were not appropriate in the first place. Brendan need not have attended P010X to challenge the IEP's appropriateness. See id. at 192-94 (considering plaintiff's arguments as to the appropriateness of the IEP); Gagliardo, 489 F.3d at 111 ("If parents believe that the state

has failed their child in this regard, they may, at their own financial risk, enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state.").

Third, the DOE spills much ink inaccurately painting the Parents as "fixated on mandating a label of 'a classroom for children with autism.'" (Def.'s Mem. 10-12; Def.'s Opp'n 8; Def.'s Reply 3-4.) However, the Parents' dispute is not about a label. It is about whether the IEP proposed an education appropriate for Brendan, who has Autism and Myasthenia Gravis. The difference between the 12:1:4 classroom proposed in the IEP and a smaller classroom with a program more tailored to Brendan's Autism is not trivial. Instead, the distinction goes to the heart of Brendan's right to a free appropriate public education.

For the foregoing reasons, the Court agrees with the IHO and finds that Brendan's IEP did not provide him with a FAPE for the 2010-2011 school year.


2. Appropriateness of the Rebecca School Placement

Generally, when assessing the second prong of the Burlington/Carter test, "the same considerations and criteria that apply in determining whether the school district's placement is appropriate should be considered in determining the

appropriateness of the parents' placement." <u>Gagliardo</u>, 489 F.3d
at 112 (citation and alterations omitted). The district court
again considers whether the unilateral placement was "reasonably
calculated to enable the child to receive educational benefits."
<u>M.H. II</u>, 685 F.3d at 252 (citation omitted); <u>see</u> <u>Gagliardo</u>, 489
F.3d at 113 ("[T]he district court is required to employ the
same objective evidence standard when ascertaining the
appropriateness of a parent's private placement . . . .")
(citation omitted).

However, while the "unilateral private placement is only
appropriate if it provides education instruction <u>specifically</u>
designed to meet the <u>unique</u> needs of a handicapped child," the
placement "need not 'meet the IDEA definition of a FAPE.'" <u>M.H.
II</u>, 685 F.3d at 246, 252 (citations and alterations omitted);
<u>see</u> <u>M.W. ex. rel. A.W. v. Bd. of Educ.</u>, No. 12 Civ. 1476, 2013
WL 2631068, at *22 (S.D.N.Y. June 12, 2013) ("[T]he standard
applied to a parent's private placement is less stringent than
that imposed on school authorities when assessing whether the
state provided a student with a FAPE."). For example, "[t]he
parents' unilateral placement need not have certified special
education teachers or an IEP for the disabled student in order
to qualify as appropriate." <u>Matrejek v. Brewster Cent. Sch.
Dist.</u>, 471 F. Supp. 2d 415, 419-20 (S.D.N.Y. 2007), <u>aff'd</u>, 293
F. App'x 20 (2d Cir. 2008); <u>see</u> <u>Frank G. v. Bd. of Educ.</u>, 459

F.3d 356, 364 (2d Cir. 2006) ("[C]ourts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs."). Because the SRO did not address the issue of whether the unilateral placement was appropriate, deference is owed to the IHO's opinion. See M.H. I, 712 F. Supp. 2d at 163.

The IHO's conclusion that the Rebecca School provided individualized services specifically tailored to Brendan's unique needs is supported overwhelmingly by the evidence. (IHO Decision 12.) Two Rebecca School interdisciplinary progress reports extensively described that Brendan, while enrolled, made progress in various areas, including academic ability, social functioning, and speech. (IHO Ex. G, at 1-6; T, at 1-8.) Moreover, Brendan's Rebecca School teacher and speech therapist described to the IHO how they tailored their instruction to Brendan's particular needs and showed that Brendan had progressed under that instruction. (Tr. 230:1-235:11, 260:8-273:18.) McCourt and Brownley further testified that the Rebecca School used an educational method targeted to Autism and that Brendan was taught in an 8:1:3 program. (Id. 204:10-206:20, 210:5-24, 212:6-213:5, 255:12-256:3, 260:8-22; see IHO Ex. R.) Finally, the Rebecca School set numerous instructional goals to sustain and measure Brendan's progress, many of which were later

copied into the IEP. (IHO Ex. G, at 7-9; T, at 9-11; see Tr. 85:12-15 ("MS. FOCHETTA: Actually, these goals are taken directly from the very back of the Rebecca School report, the interdisciplinary report of progress, from May of 2010.").)

The DOE contests none of the aforementioned evidence, but instead raises three objections, none of which the Court finds compelling. First, the DOE contends that the Rebecca School may not have provided Brendan with speech and language therapy during the summer of 2010. (Def.'s Mem. 16-17; Def.'s Reply 5-6.) The only evidence that the DOE cites in its favor is testimony that Kimmelman was "not positive" about which therapist provided speech and language therapy during the summer of 2010 (Tr. 238:3-8), and the fact that Plaintiffs never produced documents stating explicitly that Brendan received speech and language therapy during the summer of 2010 (Def.'s Mem. 16). However, Kimmelman also testified that she knew that Brendan received speech and language therapy that summer "[b]ecause all of our students at the Rebecca School receive speech and language therapy." (Tr. 238:8-13.) In addition, the Parents produced two separate reports indicating that the Rebecca School provided speech and language therapy, one from May 2010 designating Erica Levy as the therapist, and another from December 2010 designating Kimmelman. (IHO Ex. G, at 5-6; T, at 6-8.) Even under the more stringent standard used to consider

whether a FAPE has been provided, courts have found that speculation similar to the DOE's is insufficient to defeat actual evidence that therapy would regularly be provided. <u>See</u> <u>A.L. v. N.Y.C. Dep't of Educ.</u>, 812 F. Supp. 2d 492, 503 (S.D.N.Y. 2011) ("Plaintiff's speculation that [the student] might not have received occupational therapy does not constitute the denial of a FAPE."); <u>M.S. ex rel. M.S. v. N.Y.C. Dep't of</u> <u>Educ.</u>, 734 F. Supp. 2d 271, 279 (E.D.N.Y. 2010) ("[While the placement] has not always delivered full special education services to all of its students who require them, . . . this bare fact does not mean that the school would have been incapable of providing the services to [the student] required by his IEP."). Likewise, where evidence of therapy exists in the record, the Court does not find that the preponderance of the evidence standard imposes upon the Parents the onerous task of producing documentation for every month (let alone every week or every session) of therapy when no contravening evidence exists.

Second, the DOE contends that because the Rebecca School did not provide Brendan with a 1:1 health paraprofessional, the Rebecca School placement was inappropriate. (Def.'s Mem. 15-16; Def.'s Opp'n 9-11; Def.'s Reply 5.) The record supports the position that Brendan required a 1:1 health paraprofessional. (Tr. 80:6-21, 217:7-20, 219:5-10; IHO Ex. D, at 1.) However, the DOE voluntarily provided a 1:1 health paraprofessional during

Brendan's 2010-2011 enrollment at the Rebecca School, negating any need for the Rebecca School to provide one. See F.O. v. N.Y.C. Dep't of Educ., 899 F. Supp. 2d 251, 254 (S.D.N.Y. 2012). Therefore, the DOE's argument is unpersuasive, because the Rebecca School's "fail[ure]" to provide a 1:1 health paraprofessional did not implicate the quality of Brendan's education.[13] (Def.'s Mem. 15); cf. Polera v. Bd. of Educ., 288 F.3d 478, 486 (2d Cir. 2002) ("The purpose of the IDEA is to provide educational services . . . .").

If the Court reads the DOE's actual contention as an argument that the Rebecca School would not have provided a paraprofessional had the DOE not provided one, the contention remains unpersuasive, because it is unsupported by the record.

---

[13] Moreover, this aspect of the DOE's litigation strategy is disconcerting. The DOE voluntarily provided a 1:1 health paraprofessional and, in Parents' related case, 10 Civ. 8510 (DAB), filed a successful Motion to Dismiss for Lack of Subject Matter Jurisdiction, on the basis that the DOE had provided the health paraprofessional for the 2010-2011 school year. See Def.'s Mem. Law Supp. Mot. Dismiss 1, 10 Civ. 8510 (DAB), ECF No. 10 (Sept. 26, 2011). The DOE should not be able to lure the Parents with the poisoned apple of free related services, only to later claim that the private placement's failure to provide those same related services made the placement inappropriate. The Court cannot envision how the IDEA, which seeks "to ensure . . . a free appropriate public education," could endorse that actually accepting free services jeopardized tuition reimbursement and came at real economic cost. 20 U.S.C. § 1400(d)(1)(A) (emphasis added). Additionally, if the Rebecca School had responded by redundantly providing a 1:1 health paraprofessional merely to demonstrate to the Court that the school did not 'fail' to do so, the Parents would have had a difficult time convincing the Court that reimbursement was warranted for such wasteful expenditure.

While a 1:1 health professional was not included as part of

Brendan's Rebecca School tuition (IHO Ex. K, at 1), McCourt

submitted uncontroverted testimony that 1:1 health

paraprofessionals were available to Rebecca School students for

an extra charge of $22,000. (Tr. 203:11-14, 219:11-220:14.)

Moreover, "the absence of related services at [the unilateral

placement] does not <u>require</u> a finding that [the unilateral

placement] was inappropriate." <u>M.H. II</u>, 685 F.3d at 254 ("[T]he

fact that the parents obtained necessary services not offered

through the selected school from an outside agency . . . may

indeed be an appropriate consideration, but it is not

necessarily dispositive."); <u>see</u> <u>L.K. ex rel. Q v. Ne. Sch.

Dist.</u>, No. 11 Civ. 8458, 2013 WL 1149065, at *15 (S.D.N.Y. Mar.

19, 2013) ("The 'parents need not show that a private placement

furnishes every special service necessary to maximize their

child's potential.'") (quoting <u>Frank G.</u>, 459 F.3d at 365);

<u>Weaver v. Millbrook Cent. Sch. Dist.</u>, 812 F. Supp. 2d 514, 523

(S.D.N.Y. 2011) ("No one factor is necessarily dispositive in

determining whether parents' unilateral placement is 'reasonably

calculated to enable the child to receive educational

benefits.'") (quoting <u>Frank G.</u>, 459 F.3d at 364); <u>see also</u> <u>M.F.

v. N.Y.C. Bd. Of Educ.</u>, 11 Civ. 6526, 2013 WL 2435081, at *10

(S.D.N.Y. June 4, 2013) (finding non-public placement

appropriate despite "failure to offer all of the services listed

in the IEP[,] . . . a 12-month program[,] and . . . failure to provide [the student] with speech, occupational, and physical therapy, and counseling"). Because all available evidence suggests that the Rebecca School would have provided a 1:1 health paraprofessional had the DOE declined to do so, the Court finds the DOE's objection to be meritless.[14]

Finally, the DOE argues that the Court should not defer to the IHO because the IHO made two errors. (Def.'s Mem. 17-18.) First, the DOE notes that the IHO cited to E.O.'s submitted pay stubs (IHO Ex. P), when she should have cited to the Parents' income tax form (IHO Ex. M). (Def.'s Mem. 17 (citing IHO Decision 13).) However, the IHO Decision does not merit less deference simply because the IHO cited to the wrong-lettered exhibit to demonstrate the family's income. See J.F. v. N.Y.C. Dep't of Educ., No. 12 Civ. 2184, 2012 WL 5984915, at *6 (S.D.N.Y. Nov. 27, 2012) (rejecting typographical errors as a basis for refusing to defer). The second alleged error is a mere battle of semantics. The IHO wrote,

---

[14] The Parties also debate whether the DOE was required, as a matter of state and federal law, to provide Brendan with a 1:1 health professional during his unilateral placement. (See Pls.' Mem. 23-25; Def.'s Opp'n 9-11; Pls.' Reply 7-8.) Certainly, if the DOE were required to do so, then its argument that the Rebecca School was inappropriate would be even weaker. However, because the Court finds that the Rebecca School was appropriate even though the DOE voluntarily provided related services, the Court does not reach the issue of whether the DOE was also legally required to provide those services.

> As to the inappropriateness of a placement if all related services cannot be supplied on site by employees, the DOE is on extremely dangerous ground with this argument as many of its own placements are deficient in this respect and must be supplemented by Related Services Authorization (RSA)'s for mandated services.

(IHO Decision 12-13.) The DOE takes umbrage with the IHO's use of the word "deficient," which the DOE construes to mean legally inappropriate. (Def.'s Mem. 17-18.) The DOE contends that the IHO's alleged legal conclusion -- that DOE placements are often illegal -- is erroneous, and therefore deference to the IHO is not warranted. (Id.)

However, the Court is convinced that, given the cautionary language in the IHO Decision, finding all placements with RSAs to be legally inappropriate was neither the IHO's intention nor her effect. (See IHO Decision 12 ("[T]he DOE is on extremely dangerous ground . . . ."); S.F. v. N.Y.C. Dep't of Educ., No. 11 Civ. 870, 2011 WL 5419847, at *15 (S.D.N.Y. Nov. 9, 2011) ("[If the SRO had made a determination], the SRO Decision would have stated [it]."). The IHO Decision is more plausibly read as noting that the DOE was taking inconsistent positions when discussing the appropriateness of IEPs and unilateral placements. Cf. Intellivision v. Microsoft Corp., 784 F. Supp. 2d 356, 365 (S.D.N.Y. 2011) ("A court cannot ignore a party's opportunistic use of inconsistent representations . . . . Accepting [a party's] situational about-face would undermine the

integrity of the judicial process and the ability of courts to accept and rely upon the unequivocal representations of parties."), <u>aff'd</u>, 484 F. App'x 616 (2d Cir. 2012). Therefore, though the DOE might fret the IHO's choice of words, the IHO Decision is not inadequately reasoned merely because the IHO chose one of many acceptable phrasings.

After according appropriate deference to the IHO's decision and considering the DOE's arguments, the Court finds that the Rebecca School was an appropriate unilateral placement for Brendan.

### 3. Equitable Considerations

Because the Court finds that the Parents satisfied the first two prongs of the <u>Burlington</u>/<u>Carter</u> test, the Court "enjoys broad discretion in considering equitable factors relevant to fashioning relief."[15] <u>Gagliardo</u>, 489 F.3d at 112 (citing <u>Carter</u>, 510 U.S. at 16). "In exercising this discretion, a court must bear in mind that the purpose of the IDEA is to provide 'a <u>free</u> appropriate public education . . . .'" <u>P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ.</u>, 819 F. Supp. 2d 90, 117 (E.D.N.Y. 2011) (quoting <u>Burlington</u>, 471 U.S. at 369), <u>aff'd</u>, 2013 WL 2158587. Nevertheless, "[t]he cost of reimbursement . .

---

[15] The SRO did not reach this prong of the <u>Burlington</u>/<u>Carter</u> test, and the IHO found "no equitable impediment to bar the parent's [sic] request." (SRO Decision 19; IHO Decision 13.)

. may be reduced or denied" if the parent fails to notify the school district of his or her intent to enroll the student in a private school, fails to make the child available for evaluation, or otherwise acts unreasonably. 20 U.S.C. § 1412(a)(10)(C)(iii).

The Court is not persuaded by the DOE's arguments that the Parents' pre-IEP contract with the Rebecca School and failure to raise certain concerns at the CSE meeting meant that the Parents "never seriously intended to enroll [Brendan] in public school." (Def.'s Mem. 18-20; Def.'s Reply 6.) The negative inferences drawn from these two actions are "at least equally susceptible to innocuous explanations." R.K. ex rel. R.K. v. N.Y.C. Dep't of Educ., No. 09 Civ. 4478, 2011 WL 1131492, at *28 (E.D.N.Y. Jan. 21, 2011), report and recommendation adopted, 2011 WL 1131522 (E.D.N.Y. Mar. 28, 2011), aff'd sub nom., R.E., 694 F.3d 167. After two placements that the Parents found to be inappropriate, a previous IEP that produced no appropriate public school program, and a long search for a non-public program, the Parents may have found it necessary to secure a placement in case the public school system failed them again. (Tr. 395:22-396:6, 399:21-400:6; Pls.' 56.1 Stmt. ¶¶ 9, 11-12); see M.F., 2013 WL 2435081, at *12 ("This action was necessary to ensure that [the student] would have a spot at the [non-public placement] should DOE's placement prove inappropriate."). Accordingly, the mere

fact that the Parents signed a Rebecca School contract with a $2,500 non-refundable deposit before the CSE meeting "do[es] not indicate that [the Parents] acted 'truly unilaterally, bereft of any attempt to achieve a negotiated compromise and agreement on a placement.'" V.S., 2011 WL 3273922, at *15 (citation and alteration omitted) (discussing similar $2,500 non-refundable deposit paid to the Rebecca School).

The DOE's contention that the Parents "tendered notice that they disagreed with the 12:1+4 classroom for [Brendan] at the CSE meeting" but did not raise other concerns at that meeting also does not weigh against the Parents. (Def.'s Mem. 19.) The Parents could not have raised certain concerns about the placement at the CSE meeting, because they were not notified that P10X was the placement until at least a week after the meeting. (IHO Ex. 5.) Moreover, even if the Parents failed to raise certain concerns at the CSE meeting, their behavior was not inappropriate within the context of the IDEA's statutory scheme. Under the IDEA, the DOE has substantial time to amend an IEP after a due process complaint is filed. See R.E., 694 F.3d at 187 ("An important feature of the IDEA is that it contains a statutory 30-day resolution period once a 'due process complaint' is filed.") (citing 20 U.S.C. § 1415(f)(1)(B)). The Parents gave the DOE notice of general objections at the CSE meeting, and raised more detailed objections in their Due

Process Complaint. The DOE could have amended the IEP in the subsequent thirty-day period, but it chose not to do so. The Parents should not be penalized for the DOE's decision.

Contrary to the DOE's assertions, the Parents fully cooperated from the start of the IEP process until the very end. (See IHO Decision 13.) Beginning as early as December 2, 2009, the Parents allowed the DOE to observe Brendan's Rebecca School classroom to help formulate the 2010-2011 IEP. (IHO Ex. F; Tr. 60:4-23.) When no CSE meeting was called, the Parents initiated contact on April 29, 2010, seeking a meeting. (IHO Ex. J, at 1.) At the meeting, the Parents submitted various evaluations and reports to the CSE, and called in two Rebecca School staff members to discuss Brendan's needs. (Tr. 55:7-19, 400:20-23.) At the meeting, the Parents informed the CSE that they felt the 12:1:4 program was inappropriate, but stated that they remained "interested in" a 6:1:1 program, in direct disagreement with Rebecca School staff's position on a 6:1:1 classroom placement. (IHO Ex. 4; Tr. 399:8-20.) At the IHO hearing, the DOE's witness, Fochetta, testified that the Parents had cooperated with the CSE. (Tr. 105:11-13.)  Furthermore, despite disagreeing with the 12:1:4 program, the Parents conducted a tour of P10X shortly after receiving the recommended placement site. (Tr. 401:6-11.)

The Parents' constant communication with the DOE and timely notice of their complaints and intent to enroll Brendan in the Rebecca School further demonstrate their cooperation. The Parents' June 14, 2010 letter described in detail their objections to the IEP's recommended placement. (IHO Ex. J, at 3-4.) Though the Parents filed the Due Process Complaint on June 28, 2010, they stayed in regular communication with the DOE through August 13, 2010, when they notified the DOE of their final intent to enroll Brendan in the Rebecca School. (IHO Ex. J, at 6, 8.) Hence, the record shows that the Parents repeatedly made efforts to secure a FAPE through the public school system before resorting to a unilateral placement at the Rebecca School.

After reviewing the record and the DOE's contentions, and finding that the Parents cooperated with the DOE on an ongoing basis and communicated their concerns in a timely fashion, the Court holds that the balance of the equities favors reimbursement.


D. Declaratory Relief

The Parents also ask the Court to "[d]eclare that defendants [sic] were responsible to provide Brendan with a 1:1 health paraprofessional regardless of his placement during the 2010-2011 school year." (Compl. 21.) The Court agrees with the

53

SRO that this claim is procedurally barred because the Parents did not raise it in their Due Process Complaint. (SRO Decision 13-14.)

"The scope of the inquiry of the IHO, and therefore also of the SRO and this Court, is limited to matters either raised in the plaintiffs' . . . Due Process Complaint or agreed to by the defendant." D.B. v. N.Y.C. Dept. of Educ., No. 12 Civ. 4833, 2013 WL 4437247, at *6 (S.D.N.Y. Aug. 19, 2013); see 20 U.S.C. §§ 1415(c)(2)(E)(i), (f)(3)(B). Here, the Parents wrote in their Due Process Complaint that "[Brendan] must receive the related services on his 2009-2010 IEP," including "[h]ealth services aide -- full time," "during the pendency of any administrative or judicial proceeding regarding any due process complaint in connection with appropriate placement for the 2010-11 school year." (IHO Ex. A, at 4-5 ¶ 25.) However, this statement is insufficient to raise a claim for declaratory relief regarding the 2010-2011 school year; it fails to specify that the Parents sought declaratory relief and refers to the pendency of the IDEA proceedings, not to the 2010-2011 school year itself. The DOE has not agreed to consideration of this new claim by the IHO, SRO, or the Court. (See Def.'s Mem. 20-21.) Because Plaintiffs did not raise their claim for declaratory relief in their Due Process Complaint and Defendant did not agree to the raising of such a claim, the Court will not consider the claim here.

Accordingly, there is no need to reach the DOE's alternative contentions that the claim is either moot or meritless.

### III. CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' Motion for Summary Judgment and DENIES Defendant's Motion for Summary Judgment with respect to Plaintiffs' claim for full reimbursement/payment of Brendan's Rebecca School tuition for the 2010-2011 school year. With respect to Plaintiffs' claim for declaratory relief regarding Brendan's entitlement to a 1:1 health paraprofessional during the 2010-2011 school year, the Court DENIES Plaintiffs' Motion for Summary Judgment and GRANTS Defendant's Motion for Summary Judgment. The Clerk of Court is directed to enter judgment in favor of Plaintiffs in the amount of $92,100.00, to terminate the Motions located at docket numbers 11 and 15, and to close the docket in this case.


SO ORDERED.

Dated: New York, New York
       October 2, 2013

*Deborah A. Batts*
       Deborah A. Batts
       United States District Judge